

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION



CLERK, U.S. DISTRICT COURT
RICHMOND, VA.

|  |  |
|---|---|
| **ALLIANCE ENTERPRISE CORPORATION,** | ) ) ) |
| **Plaintiff,** | ) ) ) |
| **v.** | ) ) |
| **ROBERT J. MANES,**<br>        12 Baldwin Drive<br>        Falmouth, Virginia 22405 | ) ) )    Civil Action No. _3:07 cv 427_ ) |
| **and** | ) ) |
| **RICHARD C. HOOD,**<br>        206 Tyler Von Way<br>        Fredericksburg, Virginia 22405 | ) ) ) ) |
| **Defendants.** | ) ) |

## COMPLAINT

Plaintiff, Alliance Enterprise Corporation ("Alliance"), by counsel, pursuant to Rule 3 of the Federal Rules of Civil Procedure, respectfully states as follows for its Complaint against the Defendants Robert J. Manes ("Mr. Manes") and Richard C. Hood ("Mr. Hood"; together with Mr. Manes, the "Guarantors"):

## PARTIES

1.      Plaintiff Alliance is a Delaware corporation with its principal place of business at 2435 North Central Expressway, Suite 200, Richardson, Texas 75080.

2.      Defendant Robert J. Manes is a resident and citizen of the Commonwealth of Virginia who can be served with process at 12 Baldwin Drive, Falmouth, Virginia 22405.

3.      Defendant Richard C. Hood is a resident and citizen of the Commonwealth of Virginia who can be served with process at 206 Tyler Von Way, Fredericksburg, Virginia 22405.

## JURISDICTION AND VENUE

4.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the citizenship of the parties is diverse and because the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

5.      Both Mr. Manes and Mr. Hood reside in the Eastern District of Virginia, Richmond Division.  Therefore, they are both subject to the personal jurisdiction of this Court.

6.      Venue is appropriate in this District and Division pursuant to 28 U.S.C. § 1391(a) because jurisdiction is founded on diversity of citizenship and because each of the Guarantors resides in this District and Division and the events giving rise to the claims asserted herein occurred in this District and Division.

## STATEMENT OF FACTS

**A.      Loan Made by Alliance to MoonCell, Inc. ("MoonCell")**

7.      On or about November 20, 2003, Alliance and MoonCell entered into a Loan and Security Agreement (the "Loan Agreement"), a true and complete copy of which is attached hereto as Exhibit A.

8.      Pursuant to the Loan Agreement, Alliance agreed to loan certain monies to MoonCell and in return therefor was granted a security interest in certain assets of MoonCell to serve as collateral security for MoonCell's payment obligations in the Loan Agreement.

9.      In conjunction with the Loan Agreement, on November 20, 2003, MoonCell, by its President, Mr. Manes, signed a Secured Promissory Note (the "Note") payable to Alliance in the principal amount of $500,000.00, plus interest and all other applicable charges  (as may be

amended, the "Loan Indebtedness"). A true and complete copy of the Note is attached hereto as Exhibit B.

10.     Subsequent to the signing of the Note, MoonCell and Alliance entered into an Amendment to Secured Promissory Note (the "Amendment"), wherein the principal amount of the Loan Indebtedness was increased from $500,000.00 to $750,000.00. A true and complete copy of the Amendment is attached hereto as Exhibit C.

**B.     The Guaranty**

11.     In conjunction with the Loan Agreement, the Note, and the Amendment, on or about November 20, 2003, Mr. Manes and Mr. Hood each signed a Guaranty (the "Guaranty") in which each of them unconditionally guaranteed the payment of the entirety of the Loan Indebtedness and agreed to remain liable on their obligations under the Guaranty until the payment in full of the Loan Indebtedness. A true and complete copy of the Guaranty is attached hereto as Exhibit D.

12.     Section 4 of the Guaranty provides that upon the occurrence of an event of default by MoonCell in the payment of the Loan Indebtedness, each of the Guarantors shall promptly pay the amount due thereon to Alliance without notice or demand and it shall not be necessary for Alliance, in order to enforce payment by the Guarantors, to institute suit or exhaust its remedies against MoonCell or enforce any rights against any collateral that was offered as security pursuant to the Loan Agreement. See Guaranty, sec. 4.

**C.     Default Under the Note**

13.     Pursuant to sections 3 and 6 of the Note, MoonCell is in default under the terms of the Note by failing to make the required payments under the Note when due and payable.

14. As a result of such defaults, Alliance is entitled to the remedies set forth in section 7 of the Note, including declaring the principal of the Loan Indebtedness and all accrued and unpaid interest on the Note due and payable. See Note, sec. 7.

15. Accordingly, by letter dated June 21, 2007, Alliance put MoonCell on notice of its defaults and demanded payment in full in the amount of $1,347,727.37, with a per diem of $670.17. A true and complete copy of the letter is attached hereto as Exhibit E.

16. Simultaneously therewith, by letters dated June 21, 2007, Alliance put both Guarantors on notice of the defaults of MoonCell and their obligations to honor and pay the obligations of MoonCell under the terms of the Guaranty. True and complete copies of the letters are attached hereto as Exhibit F.

17. In response to the demands of Alliance, neither Mr. Manes nor Mr. Hood indicated a willingness to honor their obligations under the Guaranty. True and complete copies of the responses are attached hereto as Exhibit G.

**D.     Liability Under the Guaranty**

18. Because MoonCell has not cured its defaults under the Note despite being put on notice thereof, it remains in default, and thus the Guarantors are personally obligated to honor all obligations of MoonCell under the applicable loan documents, including the obligation to pay the Loan Indebtedness in full and in its entirety and the obligation to reimburse Alliance for its attorneys' fees and expenses incurred in the pursuit of the collection of the amounts due under the Note.

19. Accordingly, pursuant to their absolute and unconditional obligations under the Guaranty and because of the failure of MoonCell to cure its defaults, the Guarantors, jointly and severally, each owe Alliance payment in the amount of at least $1,347,727.37, with a per diem of

- 4 -

$670.17, plus all attorneys' fees and costs incurred to date and to be incurred by Alliance in pursuit of collection.

## COUNT I – BREACHES OF THE GUARANTY

20.     The allegations in paragraphs 1 through and including 19 of this Complaint are hereby incorporated by reference as if fully set forth herein.

21.     Pursuant to the Guaranty, each of the Guarantors is absolutely and unconditionally required to make payment when due and to timely perform all liabilities of MoonCell to Alliance.

22.     Alliance is entitled to enforce the Guaranty against the Guarantors, jointly and severally, because of the defaults of MoonCell under the Note and Loan Agreement.

23.     The Guaranty represents valid and enforceable obligations of each of the Guarantors, jointly and severally.

24.     Alliance has made demand upon each of the Guarantors for payment of the obligations of MoonCell due and owing to Alliance pursuant to the Note and Loan Agreement.

25.     Each of the Guarantors has refused to honor and perform their obligations under the Guaranty despite demand.

26.     Such refusals and failures represent material breaches of the Guaranty, which breaches have caused damages to Alliance.

27.     Therefore, Alliance is entitled to judgment against Mr. Manes and Mr. Hood, jointly and severally, in the amount of at least $1,347,727.37, with a per diem of $670.17, plus all fees and expenses, including court costs and reasonable attorneys' fees, incurred by Alliance in pursuit of collection.

## DAMAGES

28.     The allegations in paragraphs 1 through and including 27 of this Complaint are hereby incorporated by reference as if fully set forth herein.

29.     Alliance respectfully requests that this Court award it the following damages and other relief as follows:

(i)     a money judgment in its favor against each of the Guarantors, Mr. Manes and Mr. Hood, jointly and severally, for at least $1,347,727.37;

(ii)     other compensatory damages;

(iii)     costs and fees, including reasonable attorneys' fees; and

(iv)     such other and further relief as this Court may deem appropriate.

WHEREFORE, Alliance respectfully requests that this Court grant the relief requested above.  Alliance reserves the right to amend this Complaint and join additional parties, claims, and demands for relief, including but not limited to monetary damages and reasonable attorneys' fees and costs as may become applicable and as are permitted by law.

Date:  July 19, 2007

Respectfully submitted,
ALLIANCE ENTERPRISE CORPORATION

By: _____
Counsel

Robert S. Westermann  (VSB No. 43294)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:     (804) 788-8200
Facsimile:     (804) 788-8218

Counsel for Alliance Enterprise Corporation

- 6 -

Exhibit A



# LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (the "Agreement") dated as of November 20, 2003, is by and between **MoonCell, Inc.,** a Delaware corporation (the "Debtor") and **Alliance Enterprise Corporation,** a Delaware limited partnership (the "Secured Party").

## RECITALS:

**WHEREAS,** Debtor is making and entering into that certain Secured Promissory Note, dated of even date herewith, payable to the order of the Secured Party (as it may be amended or otherwise modified from time to time, the "Note").

**WHEREAS,** The execution and delivery of this Agreement is a condition to the Secured Party's making the extensions of credit to the Borrower.

**NOW, THEREFORE,** in consideration of the premises and for other good and valuable consideration, the adequacy, receipt and sufficiency of which are hereby acknowledged, and in order to induce the Secured Party to make loans to the Borrower, the parties hereto hereby agree as follows:

## ARTICLE I

## TERM LOANS; WARRANTS; CONDITIONS TO TERM LOANS

Section 1.1.

(a)    Term Loans.  Subject to, and upon the terms, covenants and conditions set forth herein, Secured Party agrees to loan to Debtor the original principal amount of Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "Initial Term Loan").  The Secured Party may, in its discretion, and if Debtor agrees, loan to Debtor an additional principal amount of up to Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) (the "Second Term Loan"), subject to the terms and conditions of this Agreement and payable upon the fulfillment of the conditions of the Second Term Loan contained in Section 1.3(b).  Secured Party under no obligation to make, and Debtor is under no obligation to receive, the Second Term Loan.  The Initial Term Loan shall be evidenced by the Note, payable to the order of Secured Party, in substantially the form attached hereto as Exhibit A. If the Second Term Loan (together with the Initial Term Loan, the "Term Loans") is made, the parties shall amend the Note to reflect the additional principal amount advanced to Debtor.  The Note shall be repaid and bear interest on the principal amounts outstanding thereunder at a rate and in the manner set forth in the Note.

(b)    Warrants.

(i)    In connection with the Initial Term Loan, Debtor shall issue to the Secured Party a warrant (the "Warrant"), in substantially the form attached hereto as Exhibit B, representing the right to purchase 10% of the fully diluted shares of common stock par value $0.01 per share (the "Common Stock"), of Debtor.

(ii)    If any amounts under the Note remain outstanding on March 31, 2004, the Warrant shall be exercisable for an additional 1.0% of the Company's fully diluted shares of Common Stock for each $100,000 outstanding under the Note, rounded up to the nearest $100,000 increment. If any amounts under the Note remain outstanding on June 30, 2004, the Warrant shall become exercisable for another additional 1.0% of the Company's fully diluted shares of Common Stock for each $100,000 outstanding under the Note, rounded up to the nearest $100,000 increment. If any amounts under the Note remain outstanding on September 30, 2004, the Warrant shall become exercisable for another additional 1.0% of the Company's fully diluted shares of Common Stock for each $100,000 outstanding under the Note, rounded up to the nearest $100,000 increment. Such additional percentages of the fully-diluted outstanding Common Stock for which the Warrant becomes exercisable (if any) shall be cumulative.

(iii)    If (A) an Event of Default (as defined herein) occurs and remains uncured after 60 days, or (B) if any amounts outstanding under the Note is not repaid in full on the Maturity Date (as defined in the Note), a default warrant" (the "Default Warrant"), in substantially the form attached hereto as Exhibit C shall become exercisable for an additional 15% of the Company's fully diluted shares of Common Stock.

Section 1.2.    Conditions to Term Loans.

(a)    Conditions to Initial Term Loans. The obligation of the Secured Party to make the Initial Term Loan pursuant to this Agreement is subject to the fulfillment of each of the following conditions precedent prior to such Initial Term Loan being made:

(i)    Debtor shall have executed and delivered, or caused to be executed and delivered, as applicable, this Agreement, the Note evidencing the Initial Term Loan, the Warrant and the Default Warrant, appropriate financing statements, any and all Collateral (as defined herein) requested by the Secured Party to be delivered into the possession of Secured Party and any other documentation reasonably requested by Secured Party (collectively, all such documents are referred to herein as the "Initial Loan Documents");

(ii)    all the representations, warranties, covenants and obligations of Debtor or any other party contained in this Agreement or in any of the other Initial Loan Documents are true, correct and have bee fully performed on the date hereof and on the date of the Note evidencing the Initial Term Loan;

2

(iii)   the Secured Party shall have received a copy of the corporate authorization of Debtor approving this Agreement and the other Initial Loan Documents and authorizing the transactions contemplated hereby and thereby;

(iv)   there shall not have occurred an event or set of circumstances which has resulted in, or with the passage of time could reasonably be expected to result in, a material and adverse effect on the financial condition, assets, liabilities, business, property or prospects of Debtor (a "Material Adverse Effect"), in the reasonable judgment of Secured Parties; and

(v)   all legal matters, instruments, and documents incident to, or required to perform, the Initial Loan Documents and the consummation of the transactions contemplated thereby shall be reasonably acceptable to Jenkens & Gilchrist, a Professional Corporation ("Jenkens & Gilchrist").

(b)   Conditions to Second Term Loan.  If Debtor and the Secured Party agree that the Secured Party will make the Second Term Loan, the payment by the Secured Party of the Second Term Loan pursuant to this Agreement is subject to the fulfillment of each of the following conditions precedent prior to such Second Term Loan being made:

(i)   Debtor has executed and delivered, or caused to be executed and delivered, as applicable, the amended Note evidencing the addition of the principal of the Second Term Loan and all Collateral requested by the Secured Party to be delivered into the possession of Secured Party and any other documentation reasonably requested by Secured Parties (collectively, all such documents are referred to herein as the "Additional Loan Documents", together with the Initial Loan Documents, the "Loan Documents");

(ii)   all the representations, warranties, covenants and obligations of Debtor or any other party contained in this Agreement or in any of the other Additional Loan Documents shall be true, correct and have been fully performed on the date the Secured Party makes the Second Term Loan and on the date the Note evidencing the additional principal of Second Term Loan is amended and delivered;

(iii)   the Secured Party shall have received a copy of the corporate authorization of Debtor approving the Additional Loan Documents and authorizing the transactions contemplated hereby and thereby;

(iv)   there shall not have occurred a Material Adverse Effect, in the reasonable judgment of the Secured Party;

(v)   no event shall have occurred and is continuing, or would result from the making of the Second Term Loan, which constitutes an Event of Default (as defined in herein); and

(vi)   all legal matters, instruments, and documents incident to, or required to perform, and the other Additional Loan Documents and the consummation of the

transactions contemplated thereby, and all other agreements and matters relating thereto and contemplated thereby shall be reasonably acceptable to Jenkens & Gilchrist.

## ARTICLE II

## DEFINITIONS

Section 2.1.   Definitions.   As used in this Agreement, the following terms have the following meanings:

"Account" means any "account" as such term is defined in Article or Chapter 9 of the UCC, now owned or hereafter acquired by the Debtor.

"Chattel Paper" means any "chattel paper" as such term is defined in Article or Chapter 9 of the UCC, now owned or hereafter acquired by the Debtor.

"Collateral" has the meaning specified in Section 3.1 of this Agreement.

"Copyright License" means any written agreement now or hereafter in existence granting to the Debtor any right to use any Copyright including, without limitation, the agreements identified on Schedule 4.14.

"Copyrights" means all of the following: (a) all copyrights, works protectable by copyright, copyright registrations and copyright applications of the Debtor, including, without limitation, those identified on Schedule 4.14; (b) all renewals, extensions and modifications thereof; (c) all income, royalties, damages, profits and payments relating to or payable under any of the foregoing; (d) the right to sue for past, present or future infringements of any of the foregoing; and (e) all other rights and benefits relating to any of the foregoing throughout the world; in each case, whether now owned or hereafter acquired by the Debtor.

"Deposit Accounts" means any and all deposit accounts or other bank accounts now owned or hereafter acquired or opened by the Debtor, and any account which is a replacement or substitute for any of such accounts including, without limitation, those deposit accounts identified on Schedule 4.11.

"Document" means any "document" as such term is defined in Article or Chapter 9 of the UCC, now owned or hereafter acquired by the Debtor.

"Financial Assets" means any "financial asset" as such term is defined in Article or Chapter 8 of the UCC.

"General Intangibles" means any "general intangibles" as such term is defined in Article or Chapter 9 of the UCC, now owned or hereafter acquired by the Debtor.

"Governmental Authority" means any nation or government, any state, provincial or political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

4

"Instrument" means any "instrument" as such term is defined in Article or Chapter 9 of the UCC, now owned or hereafter acquired by the Debtor, and, in any event, shall include all promissory notes, drafts, bills of exchange and trade acceptances of the Debtor, whether now owned or hereafter acquired.

"Intellectual Property" means the Copyrights, Copyright Licenses, Patents, Patent Licenses, Patent Applications, Trademarks, Trademark Licenses and Trademark Applications.

"Inventory" means any "inventory" as such term is defined in Article or Chapter 9 of the UCC, now owned or hereafter acquired by the Debtor.

"Investment Property" means any "investment property" as such term is defined in Article or Chapter 9 of the UCC, now owned or hereafter acquired by the Debtor.

"Loan Documents" means this Agreement, that certain Purchase Agreement, of even date herewith, between Debtor and Secured Party, the Note and a warrant, of even date herewith issued by Debtor to Secured Party.

"Obligations" shall mean the following:

(a)    the due, prompt, and complete payment by Debtor as and when due and payable, of all present and future amounts from time to time payable by it in connection with the Notes, including principal, interest, fees, reimbursement obligations, costs, expenses, and indemnified amounts, and all renewals, extensions, increases, substitutions, or rearrangements of any of the foregoing, all future advances relating thereto, and all other future advances by the Secured Partay to Debtor (collectively referred to herein as the "Indebtedness");

(b)    the due, prompt, and complete performance, discharge, and observance by Debtor of all of its liabilities, obligations, covenants, and agreements from time to time, now or in the future existing in connection with any of the Loan Documents or any other document or agreement executed by the Secured Party and Debtor;

(c)    the continued security interest in, and pledge of all of, the Collateral securing the Indebtedness in full force and effect to secure the Term Loans made by the Secured Party as part of the Indebtedness, and the continued entitlement of the Secured Party to rely fully on their rights granted herein with respect to such Collateral unless an appropriate release of all or any portion thereof has been executed by the Secured Party; and

(d)    the due, prompt, and complete payment by Debtor of all costs incurred by the Secured Party in connection with the negotiation and preparation of the Loan Documents, to obtain, preserve, perfect, and enforce this Agreement and the other Loan Documents, collect the Obligations, and maintain, preserve, defend, enforce, collect, and realize upon the Collateral, including, without limitation, reasonable attorneys' fees and legal expenses, taxes, insurance premiums, repairs, rent, storage costs, and expenses of sale.

5

"Patent Application" shall have the meaning set forth in the Patent and Trademark Security Agreement.

"Patent License" means any written agreement now or hereafter in existence granting to the Debtor any right to use any invention on which a Patent is in existence, including, without limitation, the agreements identified on Schedule 4.14.

"Patents" means all of the following:  (a) all patents, patent applications and patentable inventions of the Debtor, including without limitation, those identified on Schedule 4.14, and all of the inventions and improvements described and claimed therein; (b) all continuations, divisions, renewals, extensions, modifications, substitutions, continuations-in-part or reissues of any of the foregoing; (c) all income, royalties, profits, damages, awards and payments relating to or payable under any of the foregoing; (d) the right to sue for past, present and future infringements of any of the foregoing; and (e) all other rights and benefits relating to any of the foregoing throughout the world; in each case, whether now owned or hereafter acquired by the Debtor.

"Patent and Trademark Security Agreement" means a security agreement in a form satisfactory to Secured Party pursuant to which the Debtor grants to the Secured Party a first priority security interest in the Patents, the Patent Licenses, the Patent Applications, the Trademarks, the Trademark Licenses and the Trademark Applications,  for purposes of recording such security interest with any patent office of a Governmental Authority, as such agreement may be amended, supplemented or otherwise modified from time to time.

"Proceeds" means any "proceeds" as such term is defined in Article or Chapter 9 of the UCC and, in any event, shall include, but not be limited to, (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the Collateral, (b) any and all payments (in any form whatsoever) made or due and payable to the Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority (or any person acting, or purporting to act, for or on behalf of any Governmental Authority), and (c) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Trademark Application" shall have the meaning set forth in the Patent and Trademark Security Agreement.

"Trademark License" means any written agreement now or hereafter in existence granting to the Debtor any right to use any Trademark, including, without limitation, the agreements identified on Schedule 4.14.

"Trademarks" means all of the following: (a) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos, other business identifiers, prints and labels on which any of the foregoing appear, all registrations and recordings thereof and all applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof, including, without limitation, those identified in Schedule 4.14; (b) all reissues,

extensions and renewals thereof; (c) all income, royalties, damages and payments now or hereafter relating to or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements of any of the foregoing; (d) the right to sue for past, present and future infringements of any of the foregoing; (e) all rights corresponding to any of the foregoing throughout the world; and (f) all goodwill associated with and symbolized by any of the foregoing; in each case, whether now owned or hereafter acquired by the Debtor.

"UCC" means the Uniform Commercial Code as in effect in the State of Texas from time to time; provided, that if, by applicable law, the perfection or effect of perfection or non-perfection of the security interest created hereunder in any Collateral is governed by the Uniform Commercial Code as in effect on or after the date hereof in any other jurisdiction, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or the effect of perfection or non-perfection.

Section 2.2.    Other Definitional Provisions. Terms used herein that are defined in Note and are not otherwise defined herein shall have the meanings therefor specified in the Note. References to "Sections," "subsections," "Exhibits" and "Schedules" shall be to Sections, subsections, Exhibits and Schedules, respectively, of this Agreement unless otherwise specifically provided.  All definitions contained in this Agreement are equally applicable to the singular and plural forms of the terms defined. All references to statutes and regulations shall include any amendments of the same and any successor statutes and regulations. References to particular sections of the UCC should be read to refer also to parallel sections of the Uniform Commercial Code as enacted in each state or other jurisdiction where any portion of the Collateral is or may be located. Terms used herein, which are defined in the UCC, unless otherwise defined herein or in the Note, shall have the meanings determined in accordance with the UCC.

## ARTICLE III

## SECURITY INTEREST

Section 3.1.    Security Interest.  As collateral security for the prompt payment and performance in full when due of the Obligations (whether at stated maturity, by acceleration or oth- erwise), the Debtor hereby pledges and assigns to the Secured Party, and grants to the Secured Party a continuing lien on and security interest in, all of the Debtor's right, title and interest in and to the following, whether now owned or hereafter arising or acquired and wherever located (collectively, the "Collateral"):

        (a)    all Accounts;

        (b)    all Chattel Paper;

        (c)    all Instruments, including, without limitation, or in addition, all instruments evidencing indebtedness from time to time owed to the Debtor by the Subsidiaries of the Debtor, and all interest, cash and other property from time to time received, receivable or otherwise distributed or distributable in respect of or in exchange for any or all of such indebtedness;

7

(d)     all General Intangibles;

(e)     all Documents;

(f)     all Inventory;

(g)     all Financial Assets and Investment Property;

(h)     all Deposit Accounts of the Debtor and all funds, certificates, Documents, Instruments, checks, drafts, wire transfer receipts and other earnings, profits or other Proceeds from time to time representing, evidencing, deposited into or held in the Deposit Accounts; and

(i)     all products and Proceeds, in cash or otherwise, of any of the property described in the foregoing clauses (a) through (h).

Section 3.2.     Debtor Remains Liable. Notwithstanding anything to the contrary contained herein, (a) the Debtor shall remain liable under the documentation included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Secured Party of any of its rights or remedies hereunder shall not release the Debtor from any of its duties or obligations under such documentation, (c) the Secured Party shall not have any obligation under any of such documentation included in the Collateral by reason of this Agreement, and (d) the Secured Party shall not be obligated to perform any of the obligations of the Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4.1.     To induce the Secured Party to enter into this Agreement and make the Term Loans to Debtor, the Debtor represents and warrants to the Secured Party, on the date hereof, that:

Section 4.2.     Title. Debtor owns, and with respect to any Collateral acquired after the date hereof Debtor will own (unless otherwise agreed in writing by the Secured Party), the Collateral free and clear of any liens, security interests, or other encumbrances, except for the security interest granted herein.

Section 4.3.     Financing Statements. No financing statement, security agreement, or other instrument similar in effect covering all or any part of the Collateral is on file in any public office, except as may have been filed in favor of the Secured Party pursuant to this Agreement.

Section 4.4.     Organization and Authority. Debtor is a corporation duly organized, validly existing, and in good standing under the laws of Delaware, and Debtor has the power and authority to execute, deliver, and perform this Agreement and the Loan Documents to which it is a party, and the execution, delivery, and performance of this Agreement and the Loan Documents to which it is a

party by Debtor have been authorized by all necessary corporate action on the part of Debtor and will not violate the Certificate of Incorporation or Bylaws of Debtor and will not conflict with, result in a breach of, or constitute a default under, the provisions of any indenture, mortgage, deed of trust, security agreement, or other instrument or agreement pursuant to which Debtor or any of its property is bound. No authorization, approval or other action by, and no notice to, or filing with, any other party (except those obtained on or before the date hereof or contemplated hereby) is required either for the grant by Debtor of the security interest created hereby in the Collateral or for the exercise by the Secured Party of its rights under this Agreement and the other Loan Documents. The exercise by the Secured Party of any of its rights under this Agreement and the Loan Documents shall not contravene any law or any contractual restriction binding on or affecting Debtor or any assets of Debtor, and shall not result in, or require the creation of, any lien upon, or with respect to, any property of Debtor, other than as contemplated herein.

Section 4.5.   Capitalization. Immediately prior to the Closing, the authorized capital stock of Debtor will consist of (a) _____ shares of Common Stock, of which _____ shares are reserved, issued, or issued and outstanding. Except as contemplated herein, there are no options, warrants, conversion privileges or other rights, or agreements with respect to the issuance thereof, presently outstanding to purchase any of the capital stock of Debtor. No shares of Debtor's outstanding capital stock, or stock issuable upon exercise or exchange of any outstanding options or other stock issuable by Debtor, are subject to any rights of first refusal or other rights to purchase such stock (whether in favor of Debtor or any other person) pursuant to any agreement or commitment of Debtor's, except for such rights which have previously been waived. Except as contemplated herein, Debtor has no obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any of Debtor's equity securities or any interest therein or to pay any dividend or make any other distribution in respect thereof.

Section 4.6.   Valid Issuance.

(a)     The shares of Common Stock, if any, to be issued pursuant to the Warrant and the Default Warrant, if exercised, when issued and delivered to the Secured Party in accordance with the terms of this Agreement will be duly and validly issued, fully paid and nonassessable.

(b)     The outstanding shares of the capital stock of Debtor are duly and validly issued, fully paid and nonassessable, and such shares of such capital stock, and all outstanding options and other securities of Debtor have been issued in compliance with the registration and prospectus delivery requirements of the Securities Act of 1933, as amended, or in compliance with applicable exemptions therefrom, and the registration and qualification requirements of all applicable securities laws of states of the United States.

Section 4.7.   Perfection of Security Interest. This Agreement creates a valid, perfected security interest in the Collateral in favor of Secured Parties. The taking possession by Secured Parties of all instruments and cash constituting Collateral from time to time and the filing of financing statements and other lien filings, shall perfect the Secured Party's security interest in the Collateral securing the Obligations. Upon the filing of the financing statements and other lien filings delivered upon the date hereof or the delivery of the Collateral, such filings, delivery and all other

9

action necessary or appropriate to perfect or otherwise protect such security interest in favor of the Secured Party have been duly completed.

Section 4.8.   Litigation.   There is no litigation or governmental proceeding pending or threatened against Debtor or any of its properties.

Section 4.9.   Compliance with Laws.   Debtor has complied with all laws, rules and regulations applicable to its properties, activities or operations.

Section 4.10.   Use of Proceeds.   Debtor shall use the proceeds from the Term Loans for the sole purpose of paying amounts due from Debtor to McDonald Technologies, Inc.

Section 4.11.   Location of Inventory; Third Parties in Possession.   All of the Inventory is located at the places specified in Schedule 4.10. Schedule 4.10 correctly identifies the landlords or mortgagees, if any, of each location identified in Schedule 4.10. Except for the persons identified on Schedule 4.11, no person other than Debtor and Secured Party has possession of any of the Collateral. None of the Collateral has been located in any location within the past four months other than as set forth on Schedule 4.10.

Section 4.12.   Deposit, Commodity and Securities Accounts.   Schedule 4.11 correctly identifies all deposit, commodity and securities accounts owned by Debtor and the institutions holding such accounts. No person other than Debtor has control over any Investment Property.

Section 4.13.   Office Locations; Fictitious Names; Tax I.D. Number.   The principal place of business and the chief executive office of Debtor is identified on Schedule 4.10. Schedule 4.10 also sets forth all other places where Debtor keeps its books and records and all other locations where Debtor has a place of business. Debtor does not do business and has not done business during the past five years under any trade-name or fictitious business name except as disclosed on Schedule 4.12.   Debtor's United States Federal Income Tax I.D. Number is identified on Schedule 4.12.

Section 4.14.   Delivery of Collateral.   Except as provided by Section 5.2, Debtor has delivered to Secured Party all Collateral the possession of which is necessary to perfect the security interest of Secured Party therein.

Section 4.15.   Intellectual Property.   All Intellectual Property of the Debtor that is registered with or for which an application for registration has been filed with any Governmental Authority is identified on Schedules 4.14, and such information is true, correct and complete.

**ARTICLE V**

**COVENANTS**

The Debtor covenants and agrees with the Secured Party that until the Obligations are paid and performed in full:

10

Section 5.1.    Accounts.  The Debtor shall, in accordance with its customary business practices, endeavor to collect or cause to be collected from each account debtor under its Accounts, as and when due, any and all amounts owing under such Accounts.

Section 5.2.    Further Assurances; Exceptions to Perfection.  At any time and from time to time, upon the request of the Secured Party, and at the sole expense of the Debtor, the Debtor shall promptly execute and deliver all such further agreements, documents and instruments and take such further action as the Secured Party may reasonably deem necessary or appropriate to preserve and perfect its security interest in the Collateral and carry out the provisions and purposes of this Agreement or to enable the Secured Party to exercise and enforce its rights and remedies hereunder with respect to any of the Collateral.  Without limiting the generality of the foregoing, the Debtor shall, upon reasonable request by the Secured Party (a) execute and deliver to the Secured Party such financing statements as the Secured Party may from time to time require; and (b) execute and deliver to the Secured Party such other agreements, documents and instruments as the Secured Party may reasonably require to perfect and maintain the validity, effectiveness and priority of the liens intended to be created by the Loan Documents.

Section 5.3.    Third Parties in Possession of Collateral.  Debtor shall not permit any third person (including any warehouseman, bailee, agent, consignee or processor) to hold any Collateral, unless Debtor shall: (a) notify such third person of the security interests created hereby; (b) instruct such person to hold all such Collateral for Secured Party's account subject to Secured Party's instructions; and (c) take all other actions the Secured Party reasonably deems necessary to perfect and protect its and the Debtor's interests in such Collateral pursuant to the requirements of the UCC of the applicable jurisdiction where the warehouseman, bailee, consignee, agent, processor or other third person is located (including the filing of a financing statement in the proper jurisdiction naming the applicable third person as debtor and the Debtor as secured party and notifying the third person's secured lenders of the Debtor's interest in such Collateral before the third person receives possession of the Collateral in question).

Section 5.4.    Corporate Changes.  The Debtor shall not change its name, identity, or corporate structure in any manner that might make any financing statement filed in connection with this Agreement seriously misleading, and shall not change its United States Federal Tax I.D. Number unless the Debtor shall have given the Secured Party thirty (30) days prior written notice thereof and shall have taken all action reasonably deemed necessary or desirable by the Secured Party to protect its liens with the perfection and priority thereof required by the Loan Documents.  The Debtor shall not change its principal place of business, chief executive office or the place where it keeps its books and records unless it shall have given the Secured Party thirty (30) days prior written notice thereof and shall have taken all action deemed necessary or desirable by the Secured Party to cause its security interest in the Collateral to be perfected with the priority required by the Loan Documents.

Section 5.5.    Inventory.  The Debtor shall keep the Inventory at (or in transit to) any of the locations specified on Schedule 4.10 hereto or, upon thirty (30) days prior written notice to the Secured Party, at such other places within the United States of America where all action required to perfect the Secured Party's security interest in such Collateral with the priority required by the Loan Documents shall have been taken.

11

Section 5.6.   Warehouse Receipts Non-Negotiable.   The Debtor agrees that if any warehouse receipt or receipt in the nature of a warehouse receipt is issued in respect of any portion of the Collateral, such warehouse receipt or receipt in the nature thereof shall not be "negotiable" (as such term is used in Section 7.104 of the UCC) unless such warehouse receipt or receipt in the nature thereof is delivered to the Secured Party.

Section 5.7.   Intellectual Property Covenants.   If, before the Obligations are paid in full, Debtor obtains any new Intellectual Property or rights thereto or becomes entitled to the benefit of any Intellectual Property, Debtor shall give to Secured Party prompt written notice thereof, and shall execute and deliver, in form and substance satisfactory to Secured Party, a Patent and Trademark Security Agreement, as applicable, describing any such new Intellectual Property. Debtor shall: (a) prosecute diligently any copyright, patent, or trademark application at any time pending which is necessary for the conduct of Debtor's business; (b) make application on all new copyrights, patents and trademarks as reasonably deemed appropriate by Debtor; (c) preserve and maintain all rights in the Intellectual Property that are necessary for the conduct of Debtor's business; and (d) upon and after the occurrence and during the continuance of an Event of Default (as defined in the Note), use its reasonable efforts to obtain any consents, waivers or agreements necessary to enable Secured Party to exercise its remedies with respect to the Intellectual Property. Debtor shall not abandon any pending copyright, patent or trademark application, or Copyright, Patent, Trademark or any other Intellectual Property which is necessary for the conduct of Debtor's business without the prior written consent of the Secured Party.

Section 5.8.   Deposit, Commodity and Security Accounts.   Debtor shall not open any new deposit, commodity or security account or otherwise utilize any such account other than the accounts identified on Schedule 4.11 unless Debtor shall have given the Secured Party thirty (30) days prior written notice thereof and shall have taken all action deemed necessary or desirable by the Secured Party to cause its security interest therein to be perfected with priority required by the Loan Documents. After the occurrence and during the continuance of an Event of Default the Debtor shall not be authorized to make purchases and sales of the Investment Property or Financial Assets and Debtor shall take such steps as Secured Party may reasonably request to give Secured Party control over all Investment Property and Financial Assets. Debtor will not give any party control over any Investment Property or Financial Assets.

Section 5.9.  Financial and Other Information.   The Company will maintain a system of accounts in accordance with sound accounting principles and procedures, keep full and complete financial records and will furnish to the Investors the following reports:

(a)   within ninety (90) days after the end of each fiscal year, a copy of the consolidated balance sheet of the Company as of the end of such year, together with statements of income, cash flow and retained earnings of the Company for such year, audited by and accompanied by the report of nationally recognized independent public accountants (selected by the Investors and the Company), prepared in accordance with generally accepted accounting principles ("GAAP") and practices consistently applied; in addition, the Company will provide such financial statements in comparative form with the corresponding periods of the prior year;

(b)    within thirty (30) days after the end of each month, an unaudited consolidated balance sheet of the Company as of the end of such month and unaudited consolidated statements of income and cash flow for the Company for such month and for the year to date, prepared in accordance with GAAP (except for footnotes and subject to normal year-end adjustments) and practices consistently applied; in addition, the Company will provide such financial statements in comparative form with the corresponding periods of the prior year and budgeted figures for the current year; and

(c)    within thirty (30) days after the end of each fiscal year, budgeted figures approved by a majority of the directors; and

(d)    promptly, such other notices, information and data with respect to the Company as the Company delivers to the holders of Common Stock, and such other information and data as any Investor may from time to time reasonably request.

The foregoing financial statements shall be accompanied by a certificate of the chief financial officer of the Company stating that such statements have been prepared in accordance with generally accepted accounting principles consistently applied and fairly present in all material respects (other than footnotes and year-end adjustments), the financial condition and results of operations of the Company at the date thereof and for the periods covered thereby.

Section 5.10.    Access to Information.  The Company will permit the Secured Party and its representatives to inspect and to perform an audit, no more than once per calendar year, at the Secured Party's expense, on the Company's properties, books and records, to make copies of extracts from such books and records and to discuss the affairs and condition of the Company with representatives of the Company, all to such reasonable extent and at such reasonable times and intervals as the Investors may reasonably request.  If such an audit is conducted, and the audit report reflects that the budget provided to the Investors pursuant to Section 5.9(c) deviates from the actual operating budget by more than ten percent (10%) for any one or more line item(s) in the audited fiscal year, the cost of such appraisal shall be borne by the Company.  The Company may elect to dispute the Investors' audit by giving written notice to the Investors of the Company's election not more than ten (10) days following notice by the Investors of such deviation.  Upon giving notice of the Company's dispute of the Secured Party's audit, the Company will retain a reputable, independent certified public accounting firm to conduct the audit; and upon completion of said audit, the Investors' and the Company's respective auditors will meet to reconcile all material differences in the audit.  If the Secured Party's and the Company's auditors determine that the Secured Party's audit was accurate, the Company shall bear all costs associated with the audits.  If the Secured Party's and the Company's auditors determine that the Company's audit was accurate, the Secured Party shall bear all costs associated with the audits.

Section 5.11.    Intellectual Property.  From the date hereof, the Company will use all reasonable efforts to keep confidential all know-how, trade secrets, proprietary rights and other confidential intellectual property and information which is material to the business of the Company, and to provide the Company with sufficient title to, ownership of, or rights to such intellectual property as is or may become necessary for the conduct of their respective businesses, including the filing and presentation of any applications for United States and/or foreign patents as may be

13

determined by the Board of Directors. From the date hereof, the Company will enter into such agreements with its employees, consultants, licensees, customers and other third parties as may be reasonably required to carry out its obligations under this Section 4.7 and which are reasonably acceptable to the Investors.

Section 5.12.    Restricted Corporate Actions. The Company will not, without the written approval of the Secured Party, take any of the following actions:

(a)    repurchase any Common Stock;

(b)    amend the Certificate of Incorporation or Bylaws of the Company;

(c)    authorize or pay any dividend or other distribution (other than a stock dividend paid solely in shares of Common Stock) with respect to the Common Stock or sets apart any sum for such purpose;

(d)    undertake, enter into or consummate any consolidation or merger of the Company with or into any other corporation or business entity (other than with or into a wholly-owned domestic subsidiary of the Company), the sale or other transfer in a single transaction or a series of related transactions of all or substantially all of the assets of the Company, or the liquidation, dissolution, winding-up or reorganization of the Company, or undertake an initial public offering of securities of the Company;

(e)    engage in any transaction or take any action which would result in the liquidation, dissolution or recapitalization of the Company;

(f)    make any expenditure or series of related expenditures exceeding $25,000, other than as contemplated in a budget approved by the Board of Directors;

(g)    acquire, by purchase, exchange, merger or otherwise, all or substantially all of the assets, properties or capital stock of another entity in any single transaction or series of related transactions if the annual revenue of the acquired entity, based on its most recent income statement, is in excess of twenty percent (20%) of the revenue of the Company, based upon the most recent income statement of the Company;

(h)    make (or permit any subsidiary to make) any loan or advance to, or own any stock or other securities of, any subsidiary or other corporation, partnership, or other entity;

(i)    guarantee directly or indirectly, any indebtedness;

(j)    repay any debt to any employee, officer, director or other affiliate of the Company or make any loan or advance to any person or entity, including without limitation any employee, officer or director of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business, those approved by the Board of Directors;

14

     (k)    enter into any transaction with the Company's officers, directors or stockholders, other than compensation arrangements with officers, directors and stockholders who are employees of the Company;

     (l)    create any subsidiary in which the Company or any Subsidiary owns less than one hundred percent (100%) of the equity securities;

     (m)    engage in any business that is substantially different from the business conducted by the Company immediately prior to the date hereunder; or

     (n)    alter or amend the provisions of this Section 4.8.

Section 5.13.   Preservation of Corporate Existence and Property. The Company agrees to preserve, protect, and maintain, (a) its corporate existence, and (b) all material rights, franchises, accreditations, privileges, and properties.

Section 5.14.   Liability Insurance. The Company will use its commercially reasonable efforts to maintain comprehensive liability insurance (including automobile liability coverage) at regular premium rates with insurer(s) of recognized responsibility in an amount which is commercially reasonable for the benefit of itself.

Section 5.15.   Compliance. The Company shall comply, with all applicable laws, rules, regulations and orders, noncompliance with which could reasonably be expected to result in a Material Adverse Effect.

**ARTICLE VI**

**RIGHTS OF THE SECURED PARTY**

Section 6.1.   POWER OF ATTORNEY. THE DEBTOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS THE SECURED PARTY AND ANY OFFICER OR AGENT THEREOF, WITH FULL POWER OF SUBSTITUTION, AS ITS TRUE AND LAWFUL ATTORNEY-IN-FACT WITH FULL IRREVOCABLE POWER AND AUTHORITY IN THE NAME OF THE DEBTOR OR IN ITS OWN NAME, TO TAKE, WHEN A DEFAULT EXISTS, ANY AND ALL ACTIONS AND TO EXECUTE ANY AND ALL DOCUMENTS AND INSTRUMENTS WHICH THE SECURED PARTY AT ANY TIME AND FROM TIME TO TIME DEEMS NECESSARY OR DESIRABLE TO ACCOMPLISH THE PURPOSES OF THIS AGREEMENT AND, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE DEBTOR HEREBY GIVES THE SECURED PARTY THE POWER AND RIGHT ON BEHALF OF THE DEBTOR AND IN ITS OWN NAME TO DO ANY OF THE FOLLOWING WHEN A DEFAULT EXISTS, WITH NOTICE TO DEBTOR BUT WITHOUT THE CONSENT OF THE DEBTOR:

     (a)    to demand, sue for, collect or receive, in the name of the Debtor or in its own name, any money or property at any time payable or receivable on account of or in exchange for any of the Collateral and, in connection therewith, endorse checks, notes, drafts,

acceptances, money orders, documents of title or any other instruments for the payment of money under the Collateral or any policy of insurance;

(b)     to pay or discharge taxes, liens or other encumbrances levied or placed on or threatened against the Collateral;

(c)     to notify post office authorities to change the address for delivery of mail of the Debtor to an address designated by the Secured Party and to receive, open, and dispose of mail addressed to the Debtor;

(d)     to direct account debtors and any other parties liable for any payment under any of the Collateral to make payment of any and all monies due and to become due thereunder directly to the Secured Party or as the Secured Party shall direct (Debtor agrees that if any Proceeds of any Collateral (including payments made in respect of Accounts) shall be received by the Debtor while an Event of Default exists, the Debtor shall promptly deliver such Proceeds to the Secured Party with any necessary endorsements, and until such Proceeds are delivered to the Secured Party, such Proceeds shall be held in trust by the Debtor for the benefit of the Secured Party and shall not be commingled with any other funds or property of the Debtor); (ii) to receive payment of and receipt for any and all monies, claims and other amounts due and to become due at any time in respect of or arising out of any Collateral; (iii) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, proxies, stock powers, verifications and notices in connection with accounts and other documents relating to the Collateral; (iv) to commence and prosecute any suit, action or proceeding at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (v) to defend any suit, action or proceeding brought against the Debtor with respect to any Collateral; (vi) to settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as the Secured Party may deem appropriate; (vii) to exchange any of the Collateral for other property upon any merger, consolidation, reorganization, recapitalization or other readjustment of the issuer thereof and, in connection therewith, deposit any of the Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms as the Secured Party may determine; (viii) to add or release any guarantor, indorser, surety or other party to any of the Collateral; (ix) to renew, extend or otherwise change the terms and conditions of any of the Collateral; (x) to grant or issue any exclusive or nonexclusive license under or with respect to any of the Intellectual Property (subject to the rights of third parties under pre-existing licenses); (xi) to endorse the Debtor's name on all applications, documents, papers and instruments necessary or desirable in order for the Secured Party to use any of the Intellectual Property; (xii) to make, settle, compromise or adjust any claims under or pertaining to any of the Collateral (including claims under any policy of insurance); and (xiii) to sell, transfer, pledge, convey, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Secured Party were the absolute owner thereof for all purposes, and to do, at the Secured Party's option and the Debtor's expense, at any time, or from time to time, all acts and things which the Secured Party deems necessary to protect, preserve, maintain, or realize upon the Collateral and the Secured Party's security interest therein.

THIS POWER OF ATTORNEY IS A POWER COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL TERMINATION OF THIS AGREEMENT IN ACCORDANCE WITH SECTION 8.11. The Secured Party shall be under no duty to exercise or withhold the exercise of any of the rights, powers, privileges and options expressly or implicitly granted to the Secured Party in this Agreement, and shall not be liable for any failure to do so or any delay in doing so. Neither the Secured Party nor any person designated by the Secured Party shall be liable for any act or omission or for any error of judgment or any mistake of fact or law, except any of the same resulting from its or their gross negligence or willful misconduct. This power of attorney is conferred on the Secured Party solely to protect, preserve, maintain and realize upon its security interest in the Collateral. The Secured Party shall not be responsible for any decline in the value of the Collateral and shall not be required to take any steps to preserve rights against prior parties or to protect, preserve or maintain any lien given to secure the Collateral.

Section 6.2.   Assignment by the Secured Party. The Secured Party may at any time assign or otherwise transfer all or any portion of its rights and obligations under this Agreement and the other Loan Documents (including, without limitation, the Debt) to any other person, to the extent permitted by, and upon the conditions contained in, the Note, and such person shall thereupon become vested with all the benefits thereof granted to the Secured Party, herein or otherwise.

Section 6.3.   Possession; Reasonable Care. The Secured Party may, from time to time, in its sole discretion, appoint one or more agents to hold physical custody, for the account of the Secured Party, of any or all of the Collateral that the Secured Party has a right to possess. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral.

## ARTICLE VII

## EVENTS OF DEFAULT; REMEDIES

Section 7.1.   Events of Default. An "Event of Default" shall occur if (a) Debtor fails to pay when due, whether by demand or otherwise, the Obligations or any part thereof on the Maturity Date (as defined in the Note); or (b) Debtor breaches any of its representations, warranties or covenants contained in this Agreement, the Note or any other Loan Document to which it is a party and such breach continues uncured or unremedied for a period of sixty (60) days after notice within ten (10) days thereof; (c) there shall occur or exist an event or set of circumstances which, in the reasonable judgment of the Secured Party, has resulted in, or with the passage of time could reasonably be expected to result in, a Material Adverse Effect, which event or set of circumstances continues unchanged or unremedied for a period of sixty (60) days after notice within ten (10) days thereof; (d) any other party to any other Loan Document or any other document or agreement subsequently

17

executed by Secured Parties and Debtor or any of its subsidiaries breaches any of its representations, warranties or covenants contained therein; (e) Debtor admits in writing its inability to, or be generally unable to, pay its debts as such debts become due; (f) Debtor shall (i) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee, examiner, liquidator or the like of itself or of all or any substantial part of its property; (ii) make a general assignment for the benefit of its creditors; (iii) commence a voluntary case under the United States Bankruptcy Code (as now or hereafter in effect, the "Bankruptcy Code"); (iv) institute any proceeding or file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, liquidation, dissolution, winding-up, or composition or readjustment of debts; (v) fail to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against it in an involuntary case under the Bankruptcy Code; or (vi) take any corporate or other action for the purpose of effecting any of the foregoing; (g) a proceeding or case shall be commenced, without the application, approval, or consent of Debtor in any court of competent jurisdiction; seeking (i) its reorganization, liquidation, dissolution, arrangement or winding-up, or the composition or readjustment of its debts; (ii) the appointment of a receiver, custodian, trustee, examiner, liquidator or the like of Debtor or of all or any substantial part of its property; or (iii) similar relief in respect of any of Debtor under any law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or adjustment of debts, and such proceeding or case shall continue undismissed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect, for a period of sixty (60) or more days; or an order for relief against Debtor shall be entered in an involuntary case under the Bankruptcy Code; (h) Debtor shall fail to discharge within a period of sixty (60) days after the commencement thereof any attachment, sequestration, forfeiture, or similar proceeding or proceedings involving an aggregate amount in excess of $50,000 against any of its properties; (i) a final judgment or judgments for the payment of money in excess of $50,000 in the aggregate shall be rendered by a court or courts against Debtor on claims not covered by insurance or as to which the insurance carrier has denied responsibility and the same shall not be discharged, or a stay of execution thereof shall not be procured, within sixty (60) days from the date of entry thereof and Debtor shall not, within said period of sixty (60) days, or such longer period during which execution of the same shall have been stayed, appeal therefrom and cause the execution thereof to be stayed during such appeal; or (j) there shall occur a default or an event of default related to any other indebtedness of Secured Parties, which principal balance exceeds $75,000 and which default or event of default continues uncured or unremedied for a period of forty-five (45) days from its occurrence; (k) Debtor fails to use the proceeds from the Term Loans for the purpose stated herein;(l) Debtor shall have defaulted or breached any agreement with any other lender; or (m) there shall have occurred a change of control of the Debtor, which shall mean the sale of in excess of 50% of the voting securities of Debtor or the sale, in a single transaction or a series of transactions, of all, or substantially all, the assets of Debtor.

Section 7.2.   Rights and Remedies.   If an Event of Default shall have occurred and be continuing, the Secured Party shall have the following rights and remedies, to the extent necessary to satisfy the Obligations and to enforce the Secured Party's rights hereunder:

(a)   The Default Warrant shall become immediately exercisable.

(b)   In addition to all other rights and remedies granted to the Secured Party in this Agreement or in any other Loan Document or by applicable law, the Secured Party shall have

18

all of the rights and remedies of a secured party under the UCC (whether or not the UCC applies to the affected Collateral). Without limiting the generality of the foregoing, the Secured Party may (i) without demand or notice to the Debtor, collect, receive or take possession of the Collateral or any part thereof and for that purpose the Secured Party may enter upon any premises on which the Collateral is located and remove the Collateral therefrom or render it inoperable, and/or (ii) sell, lease or otherwise dispose of the Collateral, or any part thereof, in one or more parcels at public or private sale or sales, at the Secured Party's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Secured Party may deem commercially reasonable or otherwise as may be permitted by law. The Secured Party shall have the right at any public sale or sales, and, to the extent permitted by applicable law, at any private sale or sales, to bid (which bid may be, in whole or in part, in the form of cancellation of indebtedness) and become a purchaser of the Collateral or any part thereof free of any right or equity of redemption on the part of the Debtor, which right or equity of redemption is hereby expressly waived and released by the Debtor. Upon the request of the Secured Party, the Debtor shall assemble the Collateral and make it available to the Secured Party at any place designated by the Secured Party that is reasonably convenient to the Debtor and the Secured Party. The Debtor agrees that the Secured Party shall not be obligated to give more than ten (10) days prior written notice of the time and place of any public sale or of the time after which any private sale may take place and that such notice shall constitute reasonable notice of such matters. The Secured Party shall not be obligated to make any sale of Collateral if it shall determine not to do so, regardless of the fact that notice of sale of Collateral may have been given. The Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. The Debtor shall be liable for all reasonable expenses of retaking, holding, preparing for sale or the like, and all reasonable attorneys' fees, legal expenses and other costs and expenses incurred by the Secured Party in connection with the collection of the Obligations and the enforcement of the Secured Party's rights under this Agreement. The Debtor shall remain liable for any deficiency if the Proceeds of any sale or other disposition of the Collateral applied to the Obligations are insufficient to pay the Obligations in full. The Secured Party may apply the Collateral against the Obligations. The Debtor waives all rights of marshalling, valuation and appraisal in respect of the Collateral. Any cash held by the Secured Party as Collateral and all cash proceeds received by the Secured Party in respect of any sale of, collection from or other realization upon all or any part of the Collateral may, in the discretion of the Secured Party, be held by the Secured Party as collateral for, and then or at any time thereafter applied in whole or in part by the Secured Party against, the Obligations in the order determined by the Secured Party. Any surplus of such cash or cash proceeds and interest accrued thereon, if any, held by the Secured Party and remaining after payment in full of all the Obligations shall be promptly paid over to the Debtor or to whomsoever may be lawfully entitled to receive such surplus; provided that the Secured Party shall have no obligation to invest or otherwise pay interest on any amounts held by it in connection with or pursuant to this Agreement.

(c)     The Secured Party may cause any or all of the Collateral held by it to be transferred into the name of the Secured Party or the name or names of the Secured Party's nominee or nominees.

(d)     The Secured Party may exercise any and all rights and remedies of the Debtor under or in respect of the Collateral, including, without limitation, any and all rights of the Debtor to demand or otherwise require payment of any amount under, or performance of any provision of, any of the Collateral and any and all voting rights and corporate powers in respect of the Collateral. Debtor shall execute and deliver (or cause to be executed and delivered) to the Secured Party all such proxies and other instruments as the Secured Party may reasonably request for the purpose of enabling the Secured Party to exercise the voting and other rights which it is entitled to exercise pursuant to this clause (iii) and to receive the dividends, interest and other distributions which it is entitled to receive hereunder.

(e)     The Secured Party may collect or receive all money or property at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation to do so.

(f)     On any sale of the Collateral, the Secured Party is hereby authorized to comply with any limitation or restriction with which compliance is necessary, in the view of the Secured Party's counsel, in order to avoid any violation of applicable law or in order to obtain any required approval of the purchaser or purchasers by any applicable Governmental Authority.

(g)     For purposes of enabling the Secured Party to exercise its rights and remedies under this Section 7.1 and enabling the Secured Party and its successors and assigns to enjoy the full benefits of the Collateral in each case as the Secured Party shall be entitled to exercise its rights and remedies under this Section 7.1, the Debtor hereby grants to the Secured Party an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to the Debtor) to use, assign, license or sublicense any of the Intellectual Property, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and all computer programs used for the completion or printout thereof and further including in such license such rights of quality control and inspection as are reasonably necessary to prevent the Trademarks included in such license from claims of invalidation. This license shall also inure to the benefit of all successors, assigns and transferees of the Secured Party.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.1.   <u>No Waiver; Cumulative Remedies</u>. No failure on the part of the Secured Party to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise

thereof or the exercise of any other right, power, or privilege. The rights and remedies provided for in this Agreement are cumulative and not exclusive of any rights and remedies provided by law.

Section 8.2.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Debtor and the Secured Party and respective successors and assigns, except that the Debtor may not assign any of its rights or obligations under this Agreement without the prior written consent of the Secured Party.

Section 8.3.    **AMENDMENT; ENTIRE AGREEMENT. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.** The provisions of this Agreement may be amended or waived only by an instrument in writing signed by the parties hereto.

Section 8.4.    Notices.    All notices and other communications provided for in this Agreement shall be given or made in accordance with the Note.

Section 8.5.    Governing Law.    This agreement shall be governed by, and construed in accordance with, the laws of the State of Texas and applicable laws of the United States of America.

Section 8.6.    Headings. The headings, captions, and arrangements used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

Section 8.7.    Survival of Representations and Warranties.    All representations and warranties made in this Agreement or in any certificate delivered pursuant hereto shall survive the execution and delivery of this Agreement, and no investigation by the Secured Party shall affect the representations and warranties or the right of the Secured Party to rely upon them.

Section 8.8.    Counterparts.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

Section 8.9.    Waiver of Bond.    In the event the Secured Party seeks to take possession of any or all of the Collateral by judicial process, the Debtor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action.

Section 8.10.    Severability.    Any provision of this Agreement which is determined by a court of competent jurisdiction to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating

the remaining provisions of this Agreement, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 8.11.    Termination.  If all of the Obligations shall have been paid and performed in full, the Secured Party shall, upon the written request of the Debtor, execute and deliver to the Debtor a proper instrument or instruments acknowledging the release and termination of the security interests created by this Agreement, and shall duly assign and deliver to the Debtor (without recourse and without any representation or warranty) such of the Collateral as may be in the possession of the Secured Party and has not previously been sold or otherwise applied pursuant to this Agreement.

Section 8.12.    Release of Lien and Security Interest.  Secured Party agrees, that upon payment and performance in full when due of the Obligations, Secured Party authorizes Debtor to file, on Secured Party's behalf, such documents as are necessary to release and terminate the lien and security interest created hereby in the Collateral.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first written above.

DEBTOR:

MoonCell, Inc.

By:

Name: ROBERT J. MANNES

Title: PRESIDENT

SECURED PARTY:

Alliance Enterprise Corporation

By:

Name: RICK MORENO

Title: CFO

## SCHEDULE 4.10
## TO
## SECURITY AGREEMENT

### Locations

SCHEDULE 4.11
TO
SECURITY AGREEMENT

Deposit, Commodity and Security Accounts

SCHEDULE 4.12
TO
SECURITY AGREEMENT

Trade and Other Names; Federal Tax I.D. Number

SCHEDULE 4.14
TO
SECURITY AGREEMENT

Intellectual Property

Exhibit B



# SECURED PROMISSORY NOTE

$500,000.00                                                        November 20, 2003

FOR VALUE RECEIVED, the undersigned MoonCell, Inc. ("Maker"), promises to pay to the order of Alliance Enterprise Corporation, its successors and assigns ("Payee"), at the address set forth below for notices to Payee, or at such other place as Payee may from time to time designate, in lawful money of the United States of America, the principal sum of Five Hundred Thousand and No/100 Dollars ($500,000.00), or such lesser amount that may be advanced and outstanding pursuant to the terms of this Secured Promissory Note (the "Note"), together with interest on the unpaid principal balance hereof from time to time outstanding, until maturity as provided below.

1.     Secured Obligation. The indebtedness evidenced by this Note is secured by a first priority lien on the assets of Maker, all as more fully described on the Financing Statement on form UCC1 of even date herewith as filed with the Secretary of State of the State of Delaware.

2.     Interest. The outstanding principal balance of this Note shall bear interest at the rate of fourteen percent (14%) per annum from the date hereof until the Maturity Date (as hereinafter defined), but in no event shall such interest exceed the Highest Lawful Rate (as hereinafter defined). Any payments of principal or interest that become past due shall bear interest at the Highest Lawful Rate. Interest on this Note shall be capitalized in the principal balance of the Note on the last day of each month based on actual number of days elapsed out of a 365/366 day year.

3.     Payments. All amounts owing hereunder, including all accrued and unpaid interest and the outstanding principal amount hereof shall be due and payable on December 31, 2004; provided, however, that upon the closing of a sale (a "Sale") of the Company, as a whole or in part, Maker shall, to the extent that sufficient funds are received by Maker in such Sale, pay to Payee the full amounts due to Payee under this Note, including accrued interest and principal, out of the proceeds of such Sale (the "Maturity Date"). Any amounts received by Payee in excess of the amounts required to pay all amounts owed to Payee shall be returned to Maker.

4.     Notice of Payments. Maker shall have the right to pay, in whole or in part, the principal of this Note at any time without premium or penalty in minimum payments of $50,000. Any payment will first be applied to any expenses, then to accrued interest, and thereafter to principal.

5.     Time of Essence. Time is of the essence with respect to all of Maker's obligations and agreements under this Note.

6.     Events of Default. Each of the following shall constitute an "Event of Default" under this Note:

(a)     The failure, refusal or neglect of Maker to pay when due any part of the principal of, or interest on, this Note after such payment has become due and payable; or

(b)    Maker fails to perform any covenant or agreement contained herein within fifteen (15) after having received written notice of such failure from Payee;

(c)    If Maker (i) becomes insolvent, or makes a transfer in fraud of creditors, or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts as they become due; (ii) generally is not paying its debts as such debts become due; (iii) has a receiver or custodian appointed for, or a receiver or custodian takes possession of, all or substantially all of its assets, either in a proceeding brought by it or in a proceeding brought against it, and such appointment is not discharged or such possession is not terminated within sixty (60) days after the effective date thereof, or if it consents or acquiesces in such appointment or possession; (iv) files a petition for relief under the United States Bankruptcy Code or any other present or future federal or state insolvency, bankruptcy or similar laws (all of the foregoing hereinafter collectively called "Applicable Bankruptcy Law") or an involuntary petition for relief is filed against it under any Applicable Bankruptcy Law and such involuntary petition is not dismissed within sixty (60) days after the filing thereof, or an order for relief naming it is entered under any Applicable Bankruptcy Law, or any composition, rearrangement, extension, reorganization or other relief of debtors now or hereafter existing is requested or consented to by it; (v) fails to have discharged within a period of sixty (60) days any attachment, sequestration or similar writ levied upon any of its property; or (vi) fails to pay within sixty (60) days any final money judgment against it; or

(d)    The occurrence of any event that constitutes any "Event of Default" under that certain Loan and Security Agreement, of even date herewith, by and between Maker and Payee (the "Loan Agreement").

Nothing contained in this Note shall be construed to limit the Events of Default enumerated hereinabove and all such Events of Default shall be cumulative.

7.    Remedies.  Maker agrees that upon the occurrence of any Event of Default, the holder of this Note may, at its option, without further notice or demand, (a) declare the outstanding principal balance of and accrued but unpaid interest on this Note at once due and payable; (b) pursue any and all other rights, remedies and recourses available to the holder hereof, including, but not limited to, any such rights, remedies or recourses, at law or in equity, including, but not limited to, the UCC (as defined in the Loan Agreement); (c) pursue any of the remedies set forth in the Loan Agreement or (d) pursue any combination of the foregoing.

8.    No Waiver.  No delay on the part of Payee or other holder of this Note in the exercise of any power or right under this Note, shall operate as a waiver hereof, nor shall a single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.  Enforcement by the holder of this Note for the payment hereof shall not constitute an election by such holder of remedies so as to preclude the exercise of any other remedy available to such holder.

9.    Waiver.  Except as otherwise set forth herein, Maker and all endorsers, sureties, and guarantors hereof hereby jointly and severally waive all exemption rights under any

2

applicable law, and also waive presentment for payment, demand, notice of nonpayment, valuation, appraisement, protest, demand, dishonor, notice of protest, notice of intent to accelerate, notice of acceleration, and all other notices, and without further notice hereby consent to all renewals, extensions, or partial payments either before or after maturity.

10.    Costs of Collection.  If this Note is placed in the hands of any attorney for collection, or is collected by suit or through probate or bankruptcy proceeding, Maker agrees to pay Payee's reasonable attorneys' fees and disbursements in addition to other amounts due.

11.    Severability.  The invalidity, or unenforceability in particular circumstances, of any provision of this Note shall not extend beyond such provision or such circumstances and no other provision of this Note shall be affected thereby.

12.    Highest Lawful Rate.  It is expressly stipulated and agreed to be the intent of Maker and Payee at all times to comply with the applicable state and federal law governing the maximum rate or amount of interest payable on or in connection with this Note (or applicable United States federal law to the extent that it permits Payee to contract for, charge, take, reserve or receive a greater amount of interest than under state law).  If the applicable law is ever judicially interpreted so as to make the amount of interest exceed any applicable law or regulation, or render usurious any amount called for under this Note or under any of the other documents evidencing, securing or relating to this Note or any part thereof (collectively, the "Agreements"), or contracted for, charged, taken, reserved or received with respect to the indebtedness evidenced by this Note (the "Loan"), or if acceleration of the maturity of this Note or if any prepayment by Maker results in Maker having paid any interest in excess of that permitted by law, then it is Maker's and Payee's express intent that all excess amounts theretofore collected by Payee be credited on the principal balance of this Note (or, if this Note has been or would thereby be paid in full, refunded to Maker), and the provisions of this Note and the other Agreements immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to permit the recovery of the fullest amount called for hereunder and thereunder, while complying in all respects with applicable law.  The right to accelerate the maturity of this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Payee does not intend to collect any unearned interest in the event of acceleration.  All sums paid or agreed to be paid to Payee for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the applicable usury ceiling.  Notwithstanding any provision contained in this Note or in any of the other Agreements that permits the compounding of interest, including without limitation any provision by which any of the accrued interest is added to the principal amount of this Note, the total amount of interest that Maker is obligated to pay and Payee is entitled to receive with respect to this Note shall not exceed the amount calculated on a simple (i.e., non-compounded) interest basis at the Highest Lawful Rate on principal amounts actually advanced to or for the account of Maker, including the initial principal amount of this Note and any advances made pursuant to any of the Agreements (such as for the payment of taxes, insurance premiums and the like).  As used herein, the term "Highest Lawful Rate" shall mean the maximum non-usurious rate of interest which may be lawfully

contracted for, charged, taken, reserved or received by Payee from Maker in connection with the Loan under the applicable state law (or applicable United States federal law, to the extent that it permits Payee to contract for, charge, take, reserve or receive a greater amount of interest than under state law).

13.    Business Purpose.   Each of the parties hereto acknowledges and agrees that the Loan constitutes a "Qualified Commercial Loan" within the meaning of Section 306.001(9) of the Texas Finance Code and the warrants granted to Payee pursuant to the Loan Agreement does not constitute additional interest to a lender as provided in Section 306.101 of the Texas Finance Code.

14.    Notices.   All notices or demands required or permitted hereunder shall be in writing and shall be delivered personally or sent by registered or certified mail, postage prepaid:

If to Maker:

MoonCell, Inc.
PO BOX 8068
STAFFORD VA 22555
Attn: R. MANES

If to Payee:

Alliance Enterprise Corporation
2435 North Central Expressway
Suite 200
Richardson, Texas 75080
Attn: Rick Moreno

14.    **GOVERNING LAW.**    THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS.

15.    Headings.   The headings of the sections of this Note are inserted for convenience only and shall not be deemed to constitute a part hereof.

IN WITNESS WHEREOF, the undersigned has executed this Note to be effective as of the date first written above.

MAKER:

MOONCELL, INC.,
a Delaware corporation

By:     _____
Name:   ROBERT J. MANKS
Title:  PRESIDENT

Exhibit C

COPY

## AMENDMENT OF SECURED PROMISSORY NOTE

This First Amendment to the Secured Promissory Note (the "Amendment") is made and entered into by MoonCell, Inc. ("Maker") in favor of and with the consent of Alliance Enterprise Corporation ("Payee").

WHEREAS, the Maker and the Payee are parties to that certain Secured Promissory Note in the amount of $500,000 dated as of November 21, 2003 (the "Note");

WHEREAS, the Maker and Payee now desire to amend certain of the provisions of the Note.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Amendment of Secured Promissory Note (the "Amendment"), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Maker and Payee hereby covenant and agree with each other as follows:

## AGREEMENTS

1.    Principal Amount of Note. The principal sum of the note is hereby amended to be the principal sum of Seven Hundred Fifty Thousand and No/100 Dollars ($750,000) and all references to the amount of $500,000 in the Note are hereby amended to be $750,000.

2.    Section 2 of the Note is hereby amended in its entirety to read as follows:

"2.    Interest. The outstanding principal balance of this Note shall bear interest at the rate of fourteen percent (14%) per annum (i) on the aggregate principal amount of $500,000 from November 21, 2003 to February 5, 2004 for $500,000 and (ii) on the aggregate principal amount of $750,000 thereafter from February 6, 2004, until the Maturity Date, but in no event shall such interest exceed the Highest Lawful Rate (as hereinafter defined). Any payments of principal or interest that become past due shall bear interest at the Highest Lawful Rate. Interest on this Note shall be capitalized in the principal balance of the Note on the last day of each month based on actual number of days elapsed out of a 365/366 day year."

3.    Effect of Amendment. Except as amended hereby, the Note remains in full force and effect, and Maker agrees that it has no claims against Payee or defenses against payment of the Note.

4.    Governing Law. This Amendment shall be governed by, and construed in accordance with, the laws of the State of Texas and applicable laws of the United States of America.

5.    Counterparts. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

**Maker**:

MOONCELL, INC.,
a Delaware corporation

By: _____
Name: _____ ROBERT J MANAS _____
Its: _____ PRESIDENT _____

**ACKNOWLEDGED AND ACCEPTED:**

**Payee**:

ALLIANCE ENTERPRISE CORPORATION,
a Delaware corporation

By: _____
Name: _____ RICK MORENO _____
Its: _____ CFO _____

Exhibit D

## GUARANTY

**COPY**

This GUARANTY is entered into as of November 20, 2003 by and among MoonCell, Inc., a Delaware corporation ("Borrower"), Robert J. Manes ("Manes"), Richard, L. Hood ("Hood") and Quantum Prime Communications, Inc, ("Quantum," together with Manes and Hood, the "Guarantors"), in favor of and for the benefit of Alliance Enterprise Corporation, a Delaware corporation (the "Lender").

### RECITALS

A.     On even date herewith, Borrower has delivered a Secured Promissory Note to Lender in the original principal amount of $500,000.00 (as such Note may be amended from time to time to include additional advances from Lender to Borrower, the "Note").

B.     Manes and Hood are affiliates of Quantum and of Borrower and Quantum has loaned funds to Borrower in excess of $200,000 (which remain outstanding and owing to Quantum) and, consequently, Guarantors will receive direct and indirect benefits from the transactions contemplated by the Note in an amount at least equal to the obligations of the Guarantors under this Guaranty.

C.     Guarantors are willing irrevocably and unconditionally to guarantee such obligations of Borrower subject to the terms and provisions hereof.

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Guarantors, jointly and severally, hereby irrevocably and unconditionally guarantee to the Lender, the full and prompt payment and performance of the Guaranteed Indebtedness (hereinafter defined) upon the following terms:

1.     Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in that certain Loan and Security Agreement, of even date herewith, by and between Borrower and the Lender (the "Loan Agreement"). The term "Guaranteed Indebtedness", as used herein, means all of the "Obligations" as such term is defined in the Loan Agreement and shall include any and all post-petition interest and expenses (including reasonable attorneys' fees) whether or not allowed under any bankruptcy, insolvency or other similar law; provided that, notwithstanding anything to the contrary contained in this Guaranty, the Guaranteed Indebtedness shall be limited to an aggregate amount equal to the greatest amount that would not render the Guarantors' indebtedness, liabilities or obligations hereunder subject to avoidance under Sections 544, 548 or 550 of the United States Bankruptcy Code or subject to being set aside or annulled under any applicable state law relating to fraud on creditors; provided, further, that, for purposes of the immediately preceding clauses, it shall be presumed that the Guaranteed Indebtedness for the Guarantors hereunder does not equal or exceed any aggregate amount which would render the Guarantors' indebtedness, liabilities or obligations hereunder subject to being so avoided, set aside or annulled, and the burden of proof to the contrary shall be on the party asserting to the contrary. Subject to but without limiting the generality of the foregoing sentence, the provisions of this Guaranty are severable and, in any legally binding action or proceeding involving any state corporate law or any bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights and general principles of equity, if the indebtedness, liabilities or

obligations of the Guarantors hereunder would otherwise be held or determined to be void, invalid or unenforceable on account of the amount of its indebtedness, liabilities or obligations hereunder, then, notwithstanding any other provision of this Guaranty to the contrary, the amount of such indebtedness, liabilities or obligations shall, for purposes of determining the Guarantors' obligations under this Guaranty, without any further action by the Guarantors or any other individual, corporation, limited liability company, partnership, joint venture, association or other entity or organization (each, a "Person"), be automatically limited and reduced to the greatest amount which is valid and enforceable as determined in such action or proceeding.

2.     This instrument shall be an absolute, continuing, irrevocable and unconditional guaranty of payment and not a guaranty of collection, and the Guarantors shall remain liable on their obligations hereunder until the payment and performance in full of the Guaranteed Indebtedness. No set-off, counterclaim, recoupment, reduction or diminution of any obligation, or any defense of any kind or nature which the Borrower may have against the Lender or any other party, or which the Guarantors may have against the Borrower, the Lender or any other party, shall, to the extent permitted by applicable law, be available to, or asserted by, the Guarantors against the Lender or any subsequent holder of the Guaranteed Indebtedness or any part thereof or against payment of the Guaranteed Indebtedness or any part thereof.

3.     If any Guarantor becomes liable for any indebtedness owing by the Borrower to the Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of the Lender hereunder shall be cumulative of any and all other rights that the Lender may ever have against such Guarantor. The exercise by the Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

4.     Upon the occurrence of an Event of Default by the Borrower in payment or performance of the Guaranteed Indebtedness, or any part thereof, when such Guaranteed Indebtedness becomes due, whether by its terms, by acceleration or otherwise, the Guarantors shall promptly pay the amount due thereon to the Lender without notice or demand in lawful currency of the United States of America and it shall not be necessary for the Lender, in order to enforce such payment by the Guarantors, first to institute suit or exhaust its remedies against the Borrower or others liable on such Guaranteed Indebtedness, or to enforce any rights against any collateral which shall ever have been given to secure such Guaranteed Indebtedness notwithstanding any applicable law to the contrary. In the event such payment is made by any or all of the Guarantors, then such Guarantor(s) shall be subrogated to the rights then held by the Lender with respect to the Guaranteed Indebtedness to the extent to which the Guaranteed Indebtedness was discharged by such Guarantor(s) and, in addition, upon payment by such Guarantor(s) of any sums to the Lender hereunder, all rights of such Guarantor(s) against the Borrower, any other guarantor or any Collateral arising as a result therefrom by way of right of subrogation, reimbursement or otherwise, shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full of the Guaranteed Indebtedness and no such right or remedy of subrogation, reimbursement or otherwise shall be exercised or otherwise entered unless and until the Guaranteed Indebtedness has been indefeasibly paid in full.

5.    If acceleration of the time for payment of any amount payable by the Borrower under the Guaranteed Indebtedness is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of the Guaranteed Indebtedness shall, to the extent permitted by applicable law, nonetheless be payable by the Guarantors hereunder forthwith on demand by the Lender.

6.    The Guarantors hereby agree that their obligations under this Guaranty shall, to the fullest extent permitted by applicable law, not be released, discharged, diminished, impaired, reduced or affected for any reason or by the occurrence of any event or circumstance, including, without limitation, one or more of the following occurrences, events or circumstances, whether or not with notice to or the consent of the Guarantors: (a) the taking or accepting of collateral as security for any or all of the Guaranteed Indebtedness or the release, surrender, exchange or subordination of any collateral now or hereafter securing any or all of the Guaranteed Indebtedness; (b) any partial release of the liability of any Guarantor hereunder, or the full or partial release of any other guarantor from liability for any or all of the Guaranteed Indebtedness; (c) any disability of the Borrower, or the dissolution, insolvency or bankruptcy of the Borrower, any Guarantor or any other party at any time liable for the payment of any or all of the Guaranteed Indebtedness; (d) any renewal, extension, modification, waiver, amendment or rearrangement of any or all of the Guaranteed Indebtedness or any instrument, document or agreement evidencing, securing or otherwise relating to any or all of the Guaranteed Indebtedness; (e) any adjustment, indulgence, forbearance, waiver or compromise that may be granted or given by the Lender to the Borrower, the Guarantors or any other party ever liable for any or all of the Guaranteed Indebtedness; (f) any neglect, delay, omission, failure or refusal of the Lender to take or prosecute any action for the collection of any of the Guaranteed Indebtedness or to foreclose or take or prosecute any action in connection with any instrument, document or agreement evidencing, securing or otherwise relating to any or all of the Guaranteed Indebtedness; (g) the unenforceability or invalidity of any or all of the Guaranteed Indebtedness or of any instrument, document or agreement evidencing, securing or otherwise relating to any or all of the Guaranteed Indebtedness; (h) any payment by the Borrower or any other party to the Lender is held to constitute a preference under applicable bankruptcy or insolvency law or if for any other reason the Lender or any Lender is required to refund any payment or pay the amount thereof to someone else; (i) the settlement or compromise of any of the Guaranteed Indebtedness; (j) the non-perfection of any security interest or lien securing any or all of the Guaranteed Indebtedness; (k) any impairment of any collateral securing any or all of the Guaranteed Indebtedness; (l) the failure of the Lender to sell any collateral securing any or all of the Guaranteed Indebtedness in a commercially reasonable manner or as otherwise required by law; (m) any change in the corporate existence, structure or ownership of the Borrower; or (n) any other circumstance which might otherwise constitute a defense available to, or discharge of, the Borrower or the Guarantors.

7.    The Guarantors, jointly and severally, represent and warrant to the Lender as follows:

(a)    The value of the consideration received and to be received by it as a result of the Borrower and the Lender entering into the Loan Agreement and its executing and delivering this Guaranty and the other Loan Documents to which it is a party is reasonably worth at least as much as its liability and obligation hereunder and thereunder, and such liability and obligation and the Loan Agreement have benefitted and may reasonably be expected to benefit it directly or indirectly.

(c)     It has, independently and without reliance upon the Lender and based upon such documents and information as it has deemed appropriate, made its own analysis and decision to enter into the Loan Documents to which it is a party.

(d)     It has adequate means to obtain from the Borrower on a continuing basis information concerning the financial condition and assets of the Borrower and it is not relying upon the Lender to provide (and neither the Lender nor any Lender shall have any duty to provide) any such information to it either now or in the future.

8.     Each Guarantor covenants and agrees that, as long as the Guaranteed Indebtedness or any part thereof is outstanding or the Lender has any commitment under the Loan Agreement, it will comply with all covenants or agreements set forth in the Loan Agreement specifically applicable to it, the terms of which are incorporated herein by reference.

9.     When an Event of Default exists, the Lender shall have the right to set-off and apply against this Guaranty or the Guaranteed Indebtedness or both, at any time and without notice to the Guarantors, any and all deposits (general or special, time or demand, provisional or final, but excluding any account established by any Guarantor as a fiduciary for another party) or other sums at any time credited by or owing from the Lender to the Guarantors whether or not the Guaranteed Indebtedness is then due and irrespective of whether or not the Lender shall have made any demand under this Guaranty. The Lender agrees promptly to notify the Borrower after any such setoff and application of which it is aware, provided that the failure to give such notice shall not affect the validity of such setoff and application. The rights and remedies of the Lender hereunder are in addition to other rights and remedies (including, without limitation, other rights of setoff) which the Lender may have.

10.     (a)     The Guarantors hereby agree that the Subordinated Indebtedness (as defined below) shall be subordinate and junior in right of payment to the prior indefeasible payment in full of all Guaranteed Indebtedness as herein provided. The Subordinated Indebtedness shall not be payable, and no payment of principal, interest or other amounts on account thereof and no property or guarantee of any nature to secure or pay the Subordinated Indebtedness or any part thereof shall be made or given, directly or indirectly by or on behalf of the Borrower (hereafter defined) or received, accepted, retained or applied by any Guarantor unless and until the Guaranteed Indebtedness shall have been indefeasibly paid in full in cash; except that prior to occurrence of an Event of Default, the Guarantors shall have the right to receive payments on the Subordinated Indebtedness made in the ordinary course of business unless, and except to the extent that, the payment or receipt of such payments is prohibited or otherwise restricted by the Loan Agreement or another Loan Document other than this Guaranty. After the occurrence and during the continuance of an Event of Default, no payments of principal or interest may be made or given, directly or indirectly, by or on behalf of the Borrower or received, accepted, retained or applied by any Guarantor unless and until the Guaranteed Indebtedness shall have been indefeasibly paid in full in cash. If any sums shall be paid to any Guarantor by the Borrower or any other Person on account of the Subordinated Indebtedness when such payment is not permitted hereunder, such sums shall be held in trust by such Guarantor for the benefit of the Lender, and shall forthwith be paid to the Lender without affecting the liability of such

Guarantor under this Guaranty and may be applied by the Lender against the Guaranteed Indebtedness in accordance with the Loan Agreement. Upon the request of the Lender, the Guarantors shall execute, deliver and endorse to the Lender such documentation as the Lender may request from time to time to perfect, preserve and enforce its rights hereunder. For purposes of this Guaranty and with respect to the Guarantors, the term "Subordinated Indebtedness" means all indebtedness, liabilities and obligations of the Borrower to the Guarantors, whether such indebtedness, liabilities and obligations now exist or are hereafter incurred or arise, or are direct, indirect, contingent, primary, secondary, several, joint and several or otherwise, and irrespective of whether such indebtedness, liabilities or obligations are evidenced by a note, contract, open account or otherwise, and irrespective of the Persons in whose favor such indebtedness, obligations or liabilities may, at their inception, have been, or may hereafter be, created or the manner in which they have been or may hereafter be acquired by any Guarantor.

(b)     The Guarantors agree that any and all Liens (including any judgment liens) upon any of Borrower's assets securing payment of any Subordinated Indebtedness shall be and remain inferior and subordinate to any and all Liens upon any of Borrower's assets securing payment of the Guaranteed Indebtedness or any part thereof, regardless of whether such Liens in favor of the Guarantors, any Lender or the Lender presently exist or are hereafter created or attached. Without the prior written consent of the Lender, the Guarantors shall not (i) file suit against the Borrower or exercise or enforce any other creditor's right it may have against the Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any obligations of the Borrower to the Guarantors or any Liens held by any Guarantor on assets of the Borrower.

(c)     In the event of any receivership, bankruptcy, reorganization, rearrangement, debtor's relief or other insolvency proceeding involving the Borrower as debtor, the Lender shall have the right to prove and vote any claim under the Subordinated Indebtedness and to receive directly from the receiver, trustee or other court custodian all dividends, distributions and payments made in respect of the Subordinated Indebtedness until the Guaranteed Indebtedness has been indefeasibly paid in full in cash. The Lender may apply any such dividends, distributions and payments against the Guaranteed Indebtedness in accordance with the Loan Agreement.

(d)     The Guarantors agree that all promissory notes, accounts receivable, ledgers, records or any other evidence of Subordinated Indebtedness shall contain a specific written notice thereon that the indebtedness evidenced thereby is subordinated under the terms of this Guaranty.

11.     No amendment or waiver of any provision of this Guaranty or consent to any departure by the Guarantors therefrom shall in any event be effective unless the same shall be in writing and signed by the Lender except as otherwise provided in the Loan Agreement. To the extent permitted by applicable law, no failure on the part of the Lender to exercise, and no delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

12.     To the extent permitted by applicable law, any acknowledgment or new promise, whether by payment of principal or interest or otherwise and whether by the Borrower or others (including the Guarantors), with respect to any of the Guaranteed Indebtedness shall, if the statute of limitations in favor of any Guarantor against the Lender shall have commenced to run, toll the running of such statute of limitations and, if the period of such statute of limitations shall have expired, prevent the operation of such statute of limitations.

13.     This Guaranty is for the benefit of the Lender and its successors and assigns, and in the event of an assignment of the Guaranteed Indebtedness, or any part thereof, the rights and benefits hereunder, to the extent applicable to the indebtedness so assigned, may be transferred with such indebtedness. This Guaranty is binding not only on the Guarantors, but on the Guarantors' successors and assigns.

14.     The Guarantors recognize that the Lender is relying upon this Guaranty and the undertakings of the Guarantors hereunder and under the other Loan Documents to which they are a party in making extensions of credit to the Borrower under the Loan Agreement and further recognizes that the execution and delivery of this Guaranty and the other Loan Documents to which the Guarantors are party is a material inducement to the Lender in entering into the Loan Agreement and continuing to extend credit thereunder. The Guarantors hereby acknowledge that there are no conditions to the full effectiveness of this Guaranty or any other Loan Document to which they are a party.

15.     Any notice or demand to the Guarantors under or in connection with this Guaranty or any other Loan Document to which they are a party shall be deemed effective if given to the Guarantors at the address of the Borrower and/or in care of the Borrower in accordance with the notice provisions in the Loan Agreement.

16.     The Guarantors shall pay on demand all reasonable attorneys' fees and all other reasonable costs and expenses incurred by the Lender in connection with the administration, enforcement or collection of this Guaranty.

17.     The Guarantors hereby waive promptness, diligence, notice of any default under the Guaranteed Indebtedness, demand of payment, notice of acceptance of this Guaranty, presentment, notice of protest, notice of dishonor, notice of the incurring by the Borrower of additional indebtedness and all other notices and demands with respect to the Guaranteed Indebtedness and this Guaranty.

18.     The Guarantors agree that the Lender may exercise any and all rights and remedies granted to any of them under the Loan Agreement and the other Loan Documents without affecting the validity or enforceability of this Guaranty.

19.     THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF THE GUARANTORS AND THE LENDER WITH RESPECT TO THE GUARANTORS' GUARANTY OF THE GUARANTEED INDEBTEDNESS AND SUPERSEDES ANY AND ALL PRIOR

COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY THE GUARANTORS, THE LENDER AND THE LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THIS GUARANTY, AND NO COURSE OF DEALING BETWEEN OR AMONG THE GUARANTORS, ANY LENDER AND/OR THE LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY. THERE ARE NO ORAL AGREEMENTS BETWEEN OR AMONG (A) THE GUARANTORS AND (B) THE LENDER.

      20.    **THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.**

EXECUTED as of the *21* day of November, 2003.

GUARANTORS:

QUANTUM COMMUNICATIONS, INC.

By:
Name:   ROBERT J MANES
Title:   PRESIDENT

Robert J. Manes

Richard L. Hood

ALLIANCE ENTERPRISE CORPORATION

By:
Name:   RICK MORENO
Title:   CFO

Exhibit E

# HUNTON& WILLIAMS

HUNTON & WILLIAMS LLP
RIVERFRONT PLAZA, EAST TOWER
951 EAST BYRD STREET
RICHMOND, VIRGINIA 23219-4074

TEL     804 • 788 • 8200
FAX     804 • 788 • 8218

ROBERT S. WESTERMANN
DIRECT DIAL: 804-788-8327
DIRECT FAX: 804-788-8218
EMAIL:  rwestermann@hunton.com

FILE NO: 71067.000002

June 21, 2007

## VIA UPS OVERNIGHT DELIVERY

Mr. Robert J. Manes
MoonCell, Inc.
2046 Jefferson Davis Highway
Stafford, Virginia 22554

Mr. Robert J. Manes
MoonCell, Inc.
12 Baldwin Drive
Falmouth, Virginia 22405

Re:  **Breach of Obligations to Alliance Enterprise Corporation**

Dear Mr. Manes:

Please be advised that this firm represents Alliance Enterprise Corporation ("Alliance") in connection with the lending agreements between Alliance and MoonCell, Inc. ("MoonCell"). Specifically, I refer you to the Loan and Security Agreement dated November 20, 2003 between Alliance and MoonCell (the "Agreement"), in which MoonCell granted to Alliance a security interest in certain assets of MoonCell to secure MoonCell's obligations to Alliance under certain promissory notes payable to Alliance, including but not limited to the Secured Promissory Note signed by MoonCell and dated November 20, 2003 in the original principal amount of $500,000 and later amended to $750,000 (the "Note").

Please be advised that MoonCell is currently in default under the terms of the Note and Agreement by failing to make required payments to Alliance. Therefore, as provided in Section 7.1 of the Agreement, MoonCell is in default and unless such defaults are cured, Alliance intends to exercise its remedies as provided in the Note and/or the Agreement. Additionally, if the defaults are not cured, Alliance intends to exercise its rights under the Guaranty dated November 20, 2003. The current amount due and owing to Alliance to cure the defaults is $1,347,727.37, with a per diem of $670.17.

Demand is hereby made that MoonCell cure all defaults within ten (10) days of receipt of this correspondence, or on or before July 2, 2007. Your prompt response is required to prevent further action by Alliance to protect its interests. In the event that you fail to cure all defaults, or fail to make other arrangements suitable to Alliance, Alliance intends to initiate legal action

# HUNTON&
# WILLIAMS

June 21, 2007
Page 2

or take such other actions as are permitted by contract or applicable law.  If forced to initiate legal action, Alliance will seek to hold MoonCell and/or the guarantors responsible for the costs and attorneys' fees incurred by Alliance.  Therefore, your prompt attention to this matter would be in the best interests of all parties.

Nothing contained herein shall be construed as a waiver of, or in any way prejudice, all rights, remedies, or claims which Alliance may have.  Alliance hereby reserves all rights, remedies, and claims to which it is entitled by contract or applicable law.

Should you have any questions, you may call me at (804) 788-8327.

In closing, thank you for your prompt attention to this matter.

Sincerely,

Robert S. Westermann

RSW/dvg

cc:    Mr. Giovanni Capriglione (By Email)

Exhibit F

# HUNTON& WILLIAMS

HUNTON & WILLIAMS LLP
RIVERFRONT PLAZA, EAST TOWER
951 EAST BYRD STREET
RICHMOND, VIRGINIA 23219-4074

TEL      804 • 788 • 8200
FAX      804 • 788 • 8218

ROBERT S. WESTERMANN
DIRECT DIAL: 804-788-8327
DIRECT FAX:  804-788-8218
EMAIL:  rwestermann@hunton.com

FILE NO: 71067.000002

June 21, 2007

## VIA UPS OVERNIGHT DELIVERY

Mr. Robert J. Manes
12 Baldwin Drive
Falmouth, Virginia 22405

## Re: Breach of Obligations to Alliance Enterprise Corporation

Dear Mr. Manes:

Please be advised that this firm represents Alliance Enterprise Corporation ("Alliance") in connection with the lending agreements between Alliance and MoonCell, Inc. ("MoonCell"). Specifically, I refer you to the Loan and Security Agreement dated November 20, 2003 between Alliance and MoonCell (the "Agreement"), in which MoonCell granted to Alliance a security interest in certain assets of MoonCell to secure MoonCell's obligations to Alliance under certain promissory notes payable to Alliance, including but not limited to the Secured Promissory Note signed by MoonCell and dated November 20, 2003 in the original principal amount of $500,000 and later amended to $750,000 (the "Note"). I also refer you to the Guaranty that you signed, dated November 20, 2003, in which you unconditionally guaranteed all obligations of MoonCell to Alliance.

Please be advised that MoonCell is currently in default under the terms of the Note and Agreement by failing to make required payments to Alliance. As a result of these defaults, you are obligated as a guarantor to cure such defaults and to be responsible personally for the obligations owing from MoonCell to Alliance. Unless such defaults are cured, Alliance intends to exercise its remedies as provided in the Note and/or the Agreement and/or the Guaranty. The current amount due and owing to Alliance to cure the defaults is $1,347,727.37, with a per diem of $670.17.

Demand is hereby made that you cure all defaults within ten (10) days of receipt of this correspondence, or on or before July 2, 2007. Your prompt response is required to prevent further action by Alliance to protect its interests. In the event that you fail to cure all defaults, or fail to make other arrangements suitable to Alliance, Alliance intends to initiate legal action or take such other actions as are permitted by contract or applicable law. If forced to initiate legal action, Alliance will seek to hold MoonCell and/or the guarantors responsible for the costs and attorneys' fees incurred by Alliance. Therefore, your prompt attention to this matter would be in the best interests of all parties.

# HUNTON&
# WILLIAMS

June 21, 2007
Page 2

Nothing contained herein shall be construed as a waiver of, or in any way prejudice, all rights, remedies, or claims which Alliance may have.  Alliance hereby reserves all rights, remedies, and claims to which it is entitled by contract or applicable law.

Should you have any questions, you may call me at (804) 788-8327.

In closing, thank you for your prompt attention to this matter.

Sincerely,

Robert S. Westermann

RSW/dvg

cc:     Mr. Giovanni Capriglione (By Email)

# HUNTON&
# WILLIAMS

HUNTON & WILLIAMS LLP
RIVERFRONT PLAZA, EAST TOWER
951 EAST BYRD STREET
RICHMOND, VIRGINIA 23219-4074

TEL      804 • 788 • 8200
FAX      804 • 788 • 8218

ROBERT S. WESTERMANN
DIRECT DIAL: 804-788-8327
DIRECT FAX: 804-788-8218
EMAIL:  rwestermann@hunton.com

FILE NO: 71067.000002

June 21, 2007

## VIA UPS OVERNIGHT DELIVERY

Mr. Richard C. Hood
c/o ABS Vans, Inc.
206 Tyler Von Way
Fredericksburg, Virginia 22405

Re: **Breach of Obligations to Alliance Enterprise Corporation**

Dear Mr. Hood:

Please be advised that this firm represents Alliance Enterprise Corporation ("Alliance") in connection with the lending agreements between Alliance and MoonCell, Inc. ("MoonCell"). Specifically, I refer you to the Loan and Security Agreement dated November 20, 2003 between Alliance and MoonCell (the "Agreement"), in which MoonCell granted to Alliance a security interest in certain assets of MoonCell to secure MoonCell's obligations to Alliance under certain promissory notes payable to Alliance, including but not limited to the Secured Promissory Note signed by MoonCell and dated November 20, 2003 in the original principal amount of $500,000 and later amended to $750,000 (the "Note"). I also refer you to the Guaranty that you signed, dated November 20, 2003, in which you unconditionally guaranteed all obligations of MoonCell to Alliance.

Please be advised that MoonCell is currently in default under the terms of the Note and Agreement by failing to make required payments to Alliance. As a result of these defaults, you are obligated as a guarantor to cure such defaults and to be responsible personally for the obligations owing from MoonCell to Alliance. Unless such defaults are cured, Alliance intends to exercise its remedies as provided in the Note and/or the Agreement and/or the Guaranty. The current amount due and owing to Alliance to cure the defaults is $1,347,727.37, with a per diem of $670.17.

Demand is hereby made that you cure all defaults within ten (10) days of receipt of this correspondence, or on or before July 2, 2007. Your prompt response is required to prevent further action by Alliance to protect its interests. In the event that you fail to cure all defaults, or fail to make other arrangements suitable to Alliance, Alliance intends to initiate legal action or take such other actions as are permitted by contract or applicable law. If forced to initiate legal action, Alliance will seek to hold MoonCell and/or the guarantors responsible for the

# HUNTON&
# WILLIAMS

June 21, 2007
Page 2

costs and attorneys' fees incurred by Alliance.  Therefore, your prompt attention to this matter
would be in the best interests of all parties.

Nothing contained herein shall be construed as a waiver of, or in any way prejudice, all rights,
remedies, or claims which Alliance may have.  Alliance hereby reserves all rights, remedies,
and claims to which it is entitled by contract or applicable law.

Should you have any questions, you may call me at (804) 788-8327.

In closing, thank you for your prompt attention to this matter.

Sincerely,

Robert S. Westermann

RSW/dvg

cc:    Mr. Giovanni Capriglione (By Email)

Exhibit G

# MⵔⵔnCell
### INCORPORATED

June 27, 2007

Hunton & Williams
Attn:  Mr. Robert Westerman
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074

Dear Mr. Westerman,

MoonCell, Inc. does not, nor do I personally, possess funds or assets, including receivables, necessary to pay any notes or guarantees as demanded in your June 21, 2007 letter.

Sincerely,

Robert J. Manes

Richard Hood
206 Tyler Von Way
Fredericksburg, VA 22405

O (540) 659-6323
F (540) 657-9173

June 29, 2007

Hunton & Williams
Attn: Mr. Robert Westerman
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074

SUBJECT: File # 71067.000002

Dear Mr. Westerman,

I resigned as a Director of Mooncell, Inc. on the 5th of June 2006 and further resigned as "Vice President for Marketing and Sales" on the 9th of June 2006. My resignation was accepted by the Board of Directors of MoonCell, Inc., on or before the 14th of June, 2006 and forwarded to Mr. Giovanni Capriglione by Mr. Bob Manes. I have not had any direct contact with Mooncell, Inc. since that time.

Sincerely,

Richard Hood